No. 25-2616

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

United States of America.,

Plaintiff-Appellee,

v.

Eugene Alexander

Defendant-Appellant.

**Appeal from the United States District Court for the Northern District of Illinois - Eastern Division**
**No. 3:2017CR319-3 — Hon. John Blakey**

# Brief in support of motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967) and short appendix

David Gotzh #6298403
Counsel for Eugene Alexander
CJA Appellate Panel Appointment
332 S Michigan Ave, Ste 900
Chicago, Il 60604
t. 312.736.2975
e. David@MidwestAppeals.com

## Disclosure Statement

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2616

Short Caption: USA v. Eugene Alexander

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Eugene Alexander

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

David Gotzh, Appellate Solutions LLC,

Gal Pissetzky and Jennifer Snyder (Trial Counsel)

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: David Gotzh *David Gotzh* Date: 11/14/2025

Attorney's Printed Name: David Gotzh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 332 S Michigan Ave, Ste 900

Chicago, IL 60604

Phone Number: (312) 736-2975 Fax Number: N/A

E-Mail Address: David@MidwestAppeals.com

## Table of Contents

Disclosure Statement ........ i
Table of Contents ........ ii
Table of Authorities ........ iii
Preface ........ 1
Jurisdictional Statement ........ 2
Issues Presented for Review ........ 3
Statement of the Case ........ 4
1. Pre-trial ........ 4
2. Trial ........ 8
3. Post-trial and sentencing ........ 20
Summary of Argument ........ 22
Argument ........ 23
1. Mr. Alexander was proven guilty beyond a reasonable doubt. ........ 23
2. There are no non-frivolous issues that can be raised regarding the court's rulings prior to, or during, trial. ........ 25
3. There are no non-frivolous challenges to Mr. Alexander's sentence........ 27
Conclusion ........ 30
Certificate of Compliance ........ 31
Certificate of Service ........ 32
Circuit Rule 30(d) Statement ........ 33
Short Appendix ........ 34
Short Appendix Table of Contents ........ 35

## TABLE OF AUTHORITIES

### CASES


*Int'l Travelers Cheque Co. v. BankAmerica Corp.,* 660 F.2d 215 (7th Cir.1981)......25

*Jackson v. Virginia*, 443 U.S. 307 (1979)......23

*Torres-Chavez*, 744 F.3d 988 (7th Cir. 2011)......23

*U.S. v. Manganellis*, 864 F.2d 528 (7th Cir. 1988)......24

*United States v. Blassingame*, 197 F.3d 271 (7th Cir. 1999))......23

*United States v. Carrillo*, 435 F.3d 767 (7th Cir. 2006))......27

*United States v. Curry*, 977 F.2d 1042 (7th Cir. 1992)......26

*United States v. Faulkner*, 885 F.3d 488 (7th Cir. 2018)......28

*United States v. Goodwin*, 496 F.3d 636 (7th Cit. 2007)......27

*United States v. Liddell*, 543 F.3d 877 (7th Cir. 2008)......28

*United States v. Patel*, 921 F.3d 663 (7th Cir. 2019)......29

*United States v. Randy*, 81 F.3d 65 (7th Cir.1996)......28

*United States v. Reyes Hernandez*, 624 F.3d 405 (7th Cir. 2010)......28

*United States v. Rosen*, 726 F.3d 1017 (7th Cir. 2013)......29

*United States v. Stokes*, 211 F.3d 1039 (7th Cir. 2000)......26

*United States v. Torres-Chavez*, 744 F.3d 988 (7th Cir. 2014)......23

*United States v. Van Wyhe*, 965 F.2d 528 (7th Cir.1992)......27

*United States v. Warren*, 593 F.3d 540 (7th Cir. 2010)...... 23

*United States v. Zahursky*, 580 F.3d 515 (7th Cir. 2009)......25

*Zafiro v. United States*, 506 U.S. 534 (1993)......26


### STATUTES


21 USC 41(a)(1)......24

U.S.S.G. § 4B1.1(a)......28

**PREFACE**

After carefully examining the record on appeal and researching the relevant law, counsel has concluded that this appeal presents no legally nonfrivolous question.

In reaching this conclusion, counsel has thoroughly scrutinized the record for any arguable violation of the United States Constitution, the applicable federal statutes, the Federal Rules of Criminal Procedure, or the United States Sentencing Guidelines. Because counsel has concluded that no nonfrivolous issue is presented by this appeal, he requests leave to withdraw as counsel and submits this brief in accordance with *Anders v. California*, 386 U.S. 738 (1967).

## JURISDICTIONAL STATEMENT

This case appeals Mr. Eugene Alexander's conviction and sentence of count three of the indictment, one count of knowingly and intentionally process, with the intent to distribute 500 or more grams of a mixture and substances containing a detectable amount of cocaine, in violation of 21 USC 841(a)(1).

The district court therefore had original jurisdiction over this case under 18 U.S.C. § 3231, which provides jurisdiction over "all offenses against the laws of the United States."

Appellate jurisdiction is premised on 18 U.S.C. § 3742(a), which permits a defendant to appeal an otherwise final criminal sentence, and 28 U.S.C. § 1291, which grants courts of appeal jurisdiction over all final decisions of district courts of the United States. Mr. Alexander was found guilty by a jury on June 6, 2024; and the district court sentenced him to 180 months' imprisonment on August 22, 2025. See R. 408, R 530.

The final written judgment was entered by the court on August 22, 2025. See R 530. Mr. Alexander mailed a timely notice of appeal on September 2, 2025. See R. 530, 3. See also Fed. R. Crim. P. 4(c)(1)(A)(ii) (notice of appeal must be postmarked within 14 days of final judgment in criminal cases involving incarcerated litigant).

## ISSUES PRESENTED FOR APPEAL

1. Whether Mr. Alexander was proven guilty beyond a reasonable doubt.

2. Whether the district court made any errors in pre-trial or trial rulings.

3. Whether there is any non-frivolous challenge to Mr. Alexander's sentence.

## STATEMENT OF THE CASE

On May 15, 2017, Eugene Alexander (Alexander or SRT) along with other defendants, were part of a multicount criminal complaint. R 1[1]. Alexander, for his part, was charged with one count of knowingly and intentionally process, with the intent to distribute 500 or more grams of a mixture and substances containing a detectable amount of cocaine, in violation of 21 USC 841(a)(1). R 1, 2.

## MOTION TO SUPPRESS

On August 22, 2018, Alexander filed a motion to suppress, asserting a want of probable cause to stop his vehicle which led to the discovery and seizure of the cocaine at issue in this cause. R 192. The US filed a response pointing out that Alexander was part of a month's long operation investigating a drug trafficking organization, that surveillance observed him taking part in an exchange, and finally, that he attempted to flee from officers – thereby establishing the necessary probable cause to effectuate a traffic stop and search. R 204; 1-2.

## JOHN GILDIEN (MOTION TO SUPPRESS)

John is a DEA agent investigating a drug trafficking organization involving Ricardo Castenda. During his investigation, they started tracking his cellphones. R 240 at 11:11-25, 12:1-4. The investigation expanded, and by April 11, 2016, John and his strike force had information suggesting Richardo and another, Santos Godina, were trafficking narcotics. R 240 23:2-13.

[1] The record includes transcripts of the Motion to Suppress Hearing, R. 240-241; the trial, R. 436-442; and the hearing seeking a new trial sentencing hearing, R. 541-542.

On April 11, 2016, agents spotted Godina and Ricardo meeting up at a Dunkin Donuts. R 240, 24:17-23, 26:1-6. At some point a third vehicle appeared. R 240 at 25:24-25, 26:1-6, 27:16-19. Agents observed Godina exit his vehicle and hand off a red bag to the driver of the other vehicle. R 240 at 26:1-6. As Godina was one of Roberto's couriers, it was John's belief a narcotics transaction had occurred. R 240 at 27:20-25, 28:1-5. The third vehicle belonged to the defendant, Eugene Alexander, someone who the investigation was unaware of prior to April 11, 2016. R 240 at 30:22-24.

**KEVIN SELLER (MOTION TO SUPPRESS)**

Kevin was assigned to Strike Force 4 - and part of the drug investigation that eventually led to the arrest of Alexander. R 241 at 94:10-21. Kevin, and other agents on the strike force, were in radio contact on April 11, 2016, receiving location information from Ricardo's cellphone. R 241 at 98:3-20.

That day, agents tracked Ricardo's car, a Chevy Malibu, which was meeting up with a light-colored Honda believed to be associated with the drug trafficking organization. R 241 at 103:10-16, 104:5-6. Kevin observed Godina exit the Honda and approach a white Land Rover near the intersection of 23rd Ave, near Lake & Main Street in Chicago. R 241 at 104:8-17. Kevin saw Godina reach into the Land Rover's side window with the red bag, then pull his arm out holding a diffrent plastic bag containing something inside. R 241 at 104:8-17, 111:5-10.

The Land Rover exited southbound, with the Malibu and Honda following. R 241 at 106:24. It was Kevin's belief, given what he had witnessed, that a drug

transaction had taken place due to how quick the transaction was. R 241 at 106:25, 107:1-9. He also believed that Richardo, sitting in the Malibu, was counter-surveillance to ensure law enforcement wasn't watching. R 241 at 108:10.

Kevin informed his team (via radio) that he witnessed the transaction, from there the team followed the vehicles, however since each of the three was going in a different direction, the team was unable to stay together. R 241 at 112:10-16. Thereafter, Kevin's involvement was limited to listening to radio traffic from his team. R 241 at 112:17-19. On cross, Kevin noted during the exchange of bags, he was unable from his vantage point to see what was inside either of them or the driver of the Land Rover. R 241 at 120:13-15.

**MICHAEL FORD (MOTION TO SUPPRESS)**

Michael was assigned to the task forcing investigating Richardo. R 241, 142. He was in radio contact with Kevin and others on April 11, 2016. R 241, 148. When the Land Rover left after the transaction, Michael followed. R 241, 148. Michael noted that up until April 11th, the Land Rover (or it's driver) had not been identified as part of the drug trafficking organization. R 241 at 148:17-20.

The Land Rover eventually diverted from the path the Malibu and Honda were traveling; Michael and another agent, Teutonico, drove separately and tailed the Land Rover. R 241 at 152:2-21. Before Michael could make a move to get in front of the Land Rover, Alexander's vehicle turned in front of him, which prompted Michael to turn on his police lights. R 241 at 152:17-21. A short chase ensured, the

vehicles traveling at a high rate of speed through a residential neighborhood, with speeds reaching 45mph. R 241 at 153:9-15.

Other agents coming from the opposite direction of the street were able to block in the Land Rover, which came to stop. R 241, 156. Michael exited his vehicle and cleared the Land Rover from the passenger side, while agent Teutonico cleared the driver. R 241 at 154:12-16, 156:23-25, 157:1-5. Agent Teuotonico removed Alexander from the vehicle, placed him face down on the street, and used Michael's handcuffs to restrain him. R 241 at 175:5-19.

**TYLER KAZEE (MOTION TO SUPPRESS)**

Tyler was part of the same strike force investigating Ricardo. R 241 at 186:16-25, 188:4-19. On April 11, 2016, Tyler assisted in blocking the fleeing Land Rover. R 241, 200:8-10, 201:1-16. Tyler couldn't estimate the Land Rover's speed, but it was faster than what a residential area would be in his view. R 241 at 201:12-13. After the Land Rover stopped, Tyler turned on his emergency lights, drew his weapon, and watched as other officers removed Alexander from the vehicle. R 241 at 202:1-11. Tyler peeked into the open driver's side door and witnessed a red bag sitting on the rear passenger floorboard. R 241 at 203:1-6.

Tyler reached into the Land Rover, grabbed the red bag, and returned to his vehicle. R 241 at 203:13-14. Tyler peered inside the bag and saw two brick shaped objects which be believed were cocaine, and a cellphone. R 241 at 203:17-20. It was Tyler's understanding that Alexander wasn't arrested because it would tip off Godina and Roberto, and they would have stopped their pattern of behavior. R 241

at 204:22-25, 205:1-3. On cross, Tyler admitted up until that point, the investigation had no knowledge of Alexander or his land rover. R 241 at 205:17-21.

**RULING**

The trial court denied the motion to suppress, finding there was probable cause to stop, both due to the pending investigation and because Alexander's actions almost certainly violated a traffic law. R 319, 5 fn. 3.

**MOTION TO SEVER**

On May 14, 2024, Alexander filed a motion to sever, arguing Alexander was improperly joined and moreover, trying him along with the other defendants would be unduly prejudicial. R 374. This motion was denied as moot, given that at the time of the court's ruling, Alexander had indicated he was inclined to plead guilty. R 386, R 391, 3.

**PRETRIAL**

Relevant to this appeal the parties entered into an agreed order that states in part. "The government moves to bar Defendants from introducing evidence or making any argument related to a witness' absence or failure to testify at trial. The Court GRANTS AS AGREED the government's motion." R 391, 8. The matter then proceeded to trial.

**JAMES McGREAL (TRIAL)**

James is a Downers Grove Police Officer who is also a task force officer assigned to multijurisdictional investigations, including the federal government. R 436 at 42:18-25, 44:1-1-11. In April of 2016, James was assigned to DEA Chicago

Strike Force 4, which was focused on a long-term drug trafficking investigation involving Ricardo Casteanede & Santos Godina (Godina). R 436 at 44:6-7, 48:8-11 As part of his assignment, James was one of the primary case agents involved with monitoring and coordinating surveillance. R 436, 43-45. It was Jame's belief that Roberto was one of the supervisors of the drug trafficking organization, while Godina was one of his couriers. R 436, 46-48. The organization, based out of Mendota Illinois, used stash houses throughout the Chicagoland area to hide cocaine, heroin, and fentanyl smuggled in from Mexico. R 436 at 44:12-22.

On April 11, 2016, near the Dunkin Donuts on 23rd Street in Chicago, James received James received intel that there was a potential drug shipment coming into the area. R 436 at 50:1-15. During the surveillance operation, a stop was ordered of the Land Rover, which was driven by Alexander. R 436 at 63:19-25, 64:1-2. After Alexander was detained, James re-assembled his team at the Maywood Courthouse. R 436 at 64:1-9.

While searching the Land Rover, the team recovered two bricks of a controlled substance, and a cell phone – both in a red bag. R 436 at 65:2-6. James oversaw a field test of the seized bricks, which indicated they were cocaine. R 436 at 65:20-25, 66:5-6. The bricks were then taken to the DEA Chicago crime lab for further testing. R 436 at 66:8-11.

**ALISON KIDDER-MOSTROM**

Alison is a supervisory forensic scientist with the Washington State Patrol in Washington State. R 438 at 199:18-25. Prior to 2020, Alison worked with the DEA

as a senior forensic chemist. R 438 at 200:11-18. Without objection, Alison was granted leave to testify as an expert in the field pursuant to Rule 702. R 438 at 205:15-16. Alison weighed the seized drugs from the stop, which indicated 3,795 grams gross weight, with a net weight (sans packaging) of 2,994 grams of a white powdery substance. R 438 at 208:6-8, 209:4-5. Alison tested the powdery substance, and from all three bricks, the tests indicated the presence of cocaine. R 438 at 211:10-12.

**FRANK TEUTONICO**

Frank's an officer with the Berwyn police officer who working with Strike Force 4. R 439 at 278:20-25, 277:114, 281:11-14. In April of 2016, officers of his task force tracked Castaneda's location through pen registers and pings form his cell phone. R 439 at 282:1-5. On the afternoon of April 11, 2016, Frank's vehicle was parked on 23rd south of lake Street, where he noticed a white Land Rover parked right behind a light-colored Honda. R 439 at 285:22-25, 286:2-11. Frank observed Godina exit the Honda with a red cloth bag that looked "weighed down," with a bulge at the bottom. R 439 at 287:21-25, 288:1-4. Godina then approached the white land rover with the red cloth bag and returned with a different plastic bag. R 439 at 288:5-18.

Frank proceeded to follow the vehicle, along with Special Agent Mike Ford and Tyler Kazee – during their tail, Frank observed no additional occupants were seen leaving (or entering) the Land Rover. R 439 at 294:9-10, 294:15-24. Frank received an order to conduct a traffic stop, he and fellow agents activated their

police lights, and the land rover responded by accelerating away through a residential neighborhood. R 439 at 296:1-25, 297:12-23. A brief pursuit ensued before the Land Rover was blocked in by Agent Kazee's vehicle. R 439 at 299:4-25.

Alexander was detained, photographed, and handcuffed. R 439 301:20-22, 303:8-11. Afterwards, the Strike Force went to the Maywood courthouse to ensure there was no counter-surveillance or anyone else following them. R 439 at 304:1-11. Outside the Courthouse, Frank conducted a brief field test kit of the recovered bricks and took a small sample. R 439 at 308:6-25.

**MICAHAEL FORD**

Michael is an FBI agent assigned to Strike Force 4 conducting surveillance in a Ford Flex. R 439 at 387:19-25, 388:1-22, 391:13-14. Based on radio reports, Michael followed a Land Rover, which was temporarily stopped by a passing train. R 439 at 396:1-6. While following the Land Rover, Michael didn't also witness anyone enter or exit the vehicle. R 439 at 398:13-22

Frank eventually pulled up alongside the vehicle, and that's when the Land Rover made a sudden turn directly in front of his car. R 439 at 399:21-25, 400:1-4. Frank turned on his police lights, the Land Rover sped off through a residential neighborhood at speeds around 40-50 MPH. R 439 at 400:3-14. The Land Rover was compelled to stop when Agent Kazee and another vehicle blocked its escape. R 439 at 401:2-8.

As Alexander was removed from the vehicle, he asked if he was being robbed, before he was later released. R 439 at 402:6-14. Admittedly, although a red bag was

retrieved from Alexander's vehicle, Michael did not see defendant handle, receive, or touch the red bag. R 439 at 422:8-12.

**TYLER KAZEE**

Tyler is an FBI agent assigned to Strike Force group 4 investigating Castaneda and his operation. R 439 at 428:2-25. After originally surveilling Castaneda's vehicle on April 11, 2016, Tyler heard a radio call that a Land Rover was exiting 23rd. R 439 at 434:8-25. Tyler drove to intercept the vehicle, receiving radio updates along the way. R 439 at 436:22-25. Tyler was able to put eyes on the Land Rover when he arrived near 13th Ave and Oak Stret, from his viewpoint the fleeing Land Rover was traveling at a high rate of speed. R 439 at 438:6-25.

Tyler interdicted the Land Rover, and it came to a stop around 10-15 feet away from him near the intersection of 15th and Oak. R 439 at 439:1-5. At this point, Tyler had his lights one and weapon drawn – peering from his vantage point he saw a man who he later learned was Alexander, in the driver's seat. R 439 at 439:20-24. Alexander raised both hands, while Michael and Teutonico approached the other side of the vehicle and detained him. R 439 at 440:1-18. Tyler approached the driver's side door, looked inside, and retrieved a red cloth bag on the passenger floorboard. R 439 at 440:17-25. Tyler was asked to look inside the bag, where he saw two brick-shaped objects and a cellphone. R 439 at 441:1-6. Afterwards the team relocated to the Maywood courthouse. R 439 at 443:11-14. From there, custody of the bricks and cellphone were transferred to John Gildein. R 439 at 442:2-5, 443:11-14.

**RICARDO CASTANEDA**

Ricardo started selling cocaine in 2005, roughly the same year he graduated high school. R 440 523:19-25, 524:1. In 2009 Ricardo was convicted of manufacturing/delivering 900 grams of cocaine and received 12 years at 50% (implying he was sentenced to Illinois State Prison time). R 440 at 524:8-25. He was released in 2011 and resumed dealing with his brother, Refugio Castaneda. R 440 at 525:3-10. Ricardo testified that Refugio was the head of the organization – when drugs came in, Refugio was the one who took charge. R 440 at 526:9-11.

The source of the drugs was Mexico, and Ricardo's role was that of a lookout. R 440 at 527:12-16. Although Ricardo did sell drugs to customers, most of what they did was through consignment – meaning they lent the drugs out and got paid later. R 440 at 528:1-7. These distributions were generally in kilogram quantities, and consisted of heroin, and cocaine. R 440 at 528:8-12.

On May 16, 2017, at 6am, Ricardo was arrested at his house and taken to a van where he was questioned about his role in selling drugs. 532:22-25, 533:1-16. Ricardo admitted to lying to law enforcement about his role when he was initially arrested because he was scared. R 440 at 534:3-6. Ultimately, while represented by a lawyer, Richardo struck a deal with law enforcement to cooperate in this case; as a result, although he's facing a minimum 10-year sentence, the government was going to recommend 50% off of the low end of 292 months. R 440 at 536:13-19.

On April 11, 2016, Ricardo received a text from SRT (Alexander's nickname due to his proclivity for driving SRT's) to setup a deal at Dunkin Donuts on Central

Ave in Chicago. R 440 at 541:1-17. The plan was to meet up with Godina, one of them would go to a stash house to retrieve the drugs (by taking his car), and Godina would be the one to deliver the drugs. R 440, 541:20-25, 542:1-24.

For the April 11th transaction, Ricardo placed 3 kilograms into the red bag, along with a new burner phone that contained Ricardo's number. R 440 at 544:11-25. After retrieving the drugs, Ricardo eventually went to Melrose Park on 23rd, with Godina's parked across the street. R 440, 549-552. Ricardo received a text message from Alexander indicating he was arriving at his location. R 440, 553.

Godina then got out of his car holding the red bag and walked over to the defendant in his Land Rover. R 440 at 553:17-24. Godina then returned with a different bag containing $80,000. R 440 at 554:19-25, 555:1. Later Alexander reached out to Ricardo and said he was pulled over, thrown to the ground, had his picture taken, and said "don't tell nobody." R 440, 556:22-25, 557:1-6.

On cross, Ricardo acknowledged he initially lied to law enforcement about his role (during two interviews that occurred that same day on May 16, 2017), and even Godina's role in the alleged drug operation. R 440 at 584:9-21. Roberto admitted that the initial sentence of 25-30 years in prison that he faced was a "devastating" amount of time, and that he had a family to worry about. R 440 at 604:7-11. And that the plea deal, namely receiving "half off" what could have been a 25–30 year term, was "extraordinarily valuable" to him. R 440 at 669:3-5. When asked how Roberto made his profit, he indicated it came from sales by his two guys, one of which was Alexander. R 437 at 798:21-24. Roberto admitted to telling agents

initially he didn't know who SRT (Alexander) was because he wanted to hear what information the agent had before telling him what he knew. R 437 at 806:2-11.

When Roberto eventually testified in front of the grand jury on September 7, 2017 he still did not have a deal in place. R 437 at 855:5-6. Roberto eventually pled guilty on July 11, 2019, roughly a year and a half after his grand jury testimony. R 437 at 855:23-25, 856:1-2.

Turning to the issue of whether 2 or 3 kilos was given to SRT, Roberto stated the kilo's are packaged like bricks, and each usually weighs about 1 kilo. R 437 at 871:6-16. But for the April 11th exchange, there were three bricks in two seized packages. R 437 at 872:21-24. And finally, when he was the Dunkin Donuts, Roberto stated one of the phones one his person was for Alexander's use. R 437 at 873:8-25.

**JOHN GILDEIN**

John was a DEA agent assigned to Strike Force 4. R 437 at 919:4-12. In April of 2016, he was investigating Ricardo, Rufugio and Godina. R 437 at 920:7-11. On April 11, 2016, John was monitoring cellphone location information, while other officers were conducting surveillance. R 437 at 920:18-24. After Alexander's detainment, John met up with his team at the Maywood Courthouse, where he took possession of a red bag from Kazee. R 922 at 1922:6-8

John stated he looked in the bag, where he saw a cellphone and two brick-shaped objects wrapped inside. R 437 at 922:11-13. Admittedly, John was not physically present when these items were obtained from Alexander. R 437 at

1923:14-16. But did recognize the objects when presented with US Exhibit 304 and noted a field test had been conducted by other agents. R 437 at 925:22-25, 926:1-3

On redirect, John stated on April 11, 2016, his vehicle wasn't parked on 23rd but some way down on the East of 19th street. R 437 at 943:1-14. But he was aware of Alexander's Land Rover based on radio updates he received during the surveillance, and was the one who gave the order to stop the defendant's vehicle. R 437 at 943:19-24, 944:3-12.

**SANTOS GODINA**

Santos started trafficking drugs in 2010, and over time was promoted to transporting the narcotics. R 437 at 949:4-24, 950:9-10. Communication through the organization was done primarily through burner phones, which were replaced every 30 days to avoid law enforcement detection. R 437 at 954:17-22. Godina plead guilty in February of 2021, where he admitted to conspiring to possess with intent to distribute in excess of 1 kilogram of heroin, 500 grams of cocaine, and 400 grams of fentanyl. R 437 at 957:7-21. As part of the plea agreement, he promised to cooperate with the government, and the US was inclined to recommend 66% off the low-end of his impending sentence. R 437 at 958:2-12.

Godina has a history, in May of 2004 he was convicted of attempted obstruction of justice, possession of liquor by a minor and criminal trespass to a vehicle, and sentences to 180 days and 2 years probation. R 437 at 959:6-12. And in November 2005 he was convicted of aggravated discharge of a firearm and received

4 years. R 437 at 959:13-17. Godina knew Alexander since 2010 and was able to make an in court ID. R 437 at 960:19-21, 961:1-11.

On April 11, 2016, Alexander was involved with a narcotics transaction that was arranged by Roberto. R 437 at 960:23-25. Ricardo and Godina met up at a Dunkin Donuts, Ricardo retrieved drugs from the stash use while Godina stayed behind. R 437 at 962:17-25, 963:1-4. When Richardo returned, he said to Godina "the shit for SRT is in the car," and that "shit" meant narcotics. R 437 at 964:22-25, 965:1. Godina then went out to meet Alexander. R 437 at 964:14-18. Godina stated that Alexander could have "been driving a Jeep, but I don't know." R 437 at 969:25, 970:1.

When Alexander arrived, he parked two cars ahead of Godina on the east side of 23rd. R 437 at 970:5-18. Ricardo was assigned lookout duty. R 437 at 989:13-14. Godina exited his Honda and carried a red bag containing narcotics and handed it to him through his driver's side window. R 437 at 974:4-6. In exchange, Alexander gave him a bag that contained a phone and money. R 437, 975:1. When he handed the bag to Alexander, Godina saw a person on the other side of the street that looked like law enforcement, upon which he told the defendant to "[j]ust hurry up." R 437, 975:2-11.

Although Godina was arrested in May of 2017, he didn't cooperate until three years later, and that he would not be sentenced until after he concluded his testimony in Alexander's trial. R 437 at 1008:18-21, 1010:20-22.

**WILFRED TAYLOR**

Wilfred testified as a 702 expert in the field of drug operations. R 441 at 1159:24-25. Wilfred testified that many drug operations use stash houses when the drugs arrive to their destination city, which are then transferred to the wholesale customers. R 441 at 1164:10-15. A wholesale customer is someone who moves kilogram levels of drugs, and from there it's broken down to the street level, usually by the gram or fraction of a gram. R 441 at 1165:1-3.

Customary, Wilfred notices most cocaine kilos are sold as bricks; compressed hard in a rectangle shape. R 441 at 1166:1-7. Transportation of the drugs is sometimes left to someone called a courier, and these transactions were often done in public places or residential neighborhoods. R 441 at 1167:3-10. Many times, that kilo is also diluted to maximize sales, but street sales is usually 1/10th of a gram. R 441 at 1168:17-19. As far as payment often depends, but if there's trust from above, it's fronted on consignment. R 441 at 1169:1-6.

Burner phones would be used, sometimes for one transaction or for a short period of time, then would be discarded. R 441 at 1172:9-20. This was done to frustrate the subpoena process, but in any event, it was not uncommon to see a drug trafficker have multiple burner phones on his person. R 441 at 1172:18-20.

**RIGHT TO NOT TESTIFY**

Alexander was asked if he was satisfied with his representation, which he indicated he was. R 441 at 1192:6-8. He was then asked if he wished to waive his right to testify, which he stated in the affirmative. R 441 at 1192:10-12. The court

found Alexander knowingly and voluntarily waived his right to testify. R 441 at 1192:22-24

**RELEVANT JURY INSTRUCTIONS**

After both sides rested, the court issued jury instructions. As to Godina and Roberto, the court stated "[y]ou may give these witnesses' testimony whatever weight you believe is appropriate, keeping in mind that you must consider that testimony with caution and great care." R 441 at 1241:15-20. It further instructed the jury to consider Defendant Miller's conduct separate from Alexander's for purposes of determining guilt. R 441 a 1242:3-10, 1242:16-19, 1243:8-10.

**IN LIMINE ORDER REVISITED**

At sidebar, an issue arose whether defense counsel could raise in closing arguments the omission of Agent Seller's testimony – the US responded that there was an in limine order, by agreement, prohibiting discussion of this omission. R 441 at 1264:20-25, 1268:13-15. The court ordered that any reference to "Sellers?" be struck from Alexanders visual power point slide. R 544 at 1272:16-17. After deliberations, the jury found Alexander guilty.

**MOTION FOR A NEW TRIAL & ACQUITAL**

On August 1, Alexander filed a motion for acquittal and a new trial arguing four points of error, namely a failure to prove Alexander "knowingly" possessed drugs, that the trial court erred by granting the motion to suppress in light of "Agent Teutonico's testimony at trial," false testimony, and Alexander's Motion to Sever. R 420, R 421 at 3-16. Also germane to the motion for a new trial was a

footnote that stated "Mr. Alexander is filing the instant motion without the benefit of trial transcripts." R 421 at 2. At hearing, the US noted that Alexander's motion failed to indicate a material discrepancy between the testimonies of the different officers, and appeared aimed at where each might have been positioned at the time of the arrest. R 541 at 3:5-8. The core issue, such as where the transactions took place, were not in dispute as far as the US was concerned. *Id*.

Alexander argued that agents Sellers and Teutonico each said they "had the eye" on the transaction, and only one could have been in charge, suggesting an inconsistency. R 541 at 10:15-20. The government reiterated that Alexander's objection to the omission of agent Sellers at trial was a product of an agreed order. R 541 7:14-17. The Court took the arguments under advisement. R 541 at 12:11-12.

**SENTENCING BRIEFS**

Alexander's objections to the State's sentencing memo concedes that his criminal history as indicated in the PSI warrants consideration under Cat III, as he is a career offender. R 513 at 4, R 500 PSI at ¶¶ 33, 32. This upgraded his offense level from 26 to 34, which increased the suggested sentencing range to 262-327 months. R 513 at 5. However, Alexander argued he was a low recidivism risk and that his co-defendants (who testified at trial) received lighter sentences. R 513 at 12-14.

**RULING ON POST JUDGMENT MOTIONS AND SENTENCING HEARING**

The court noted that the two cooperators testified "credibly" at least to the material issues, as did the law enforcement officers. R 542 at 5:14-24. The Court

found "no material" discrepancies" in the witness testimony. R 542 at 6:4-8. The Court found all undeveloped arguments were waived but found the motion to suppress was properly addressed. R 542 at 7:3-23. As to that argument, the trial court found Alexander's efforts to suggest that two agents were unaware they were in the exact same spot was a mischaracterization of the record. R 542 at 8:14-25, 9:1-4.

Turning to sentencing, the trial court noted Alexander was previously found guilty of two felonies; attempted murder in 1994 and possession of controlled substance in 1995. See R 500, PSR at ¶¶ 33, 32. Overall the trial court found the risk of recidivism was less pronounced due to the defendant's age, and the amount of time that had passed since his previous convictions. R 542 at 49:8-15.

The court sentenced Alexander to a downward deviation of 180 months and a $100 fine. R 542 at 52:23-25, 53:1-3. Alexander did not object to the sentence or sought further elaboration for its reasons under 3553. R 542 at 53:4-11.

## SUMMARY OF ARGUMENT

There is no nonfrivolous argument to challenge either the conviction or sentence in this case. Mr. Alexander was found guilty by a jury of knowingly possessed with intent to distribute over 500 grams of cocaine. The facts of the case at trial supported the verdict where the evidence established that Mr. Alexander was present at an exchange, that no one was observed entering or exiting the vehicle from the exchange until he was detained, that his failure to comply with traffic laws provided probable cause to detain him, and that upon detainment a red bag was recovered containing approximately 3 kilos of cocaine. Lab tests indicate the substance was cocaine, expert testimony indicated it was packaged in a customary manner for an organization distributing cocaine in a wholesale manner, and testimony from members of the drug organization indicated that Alexander was one for their courtiers.

None of the issues that were contested in pre-trial or post-trial motions present nonfrivolous issues for purposes of appeal. Moreover, Mr. Alexander's sentence was procedurally and substantively sound.

## I. THERE IS NO ERROR AS TO REASONABLE DOUBT

Alexander filed a motion for acquittal and alternatively, argued there was a want of reasonable doubt in his motion for a new trial. Each is addressed in turn.

A court considering a Fed. R. Crim. P. 29 motion asks "whether, after viewing the evidence in light most favorable to the government, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The movant "bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). The court must defer to the credibility determinations of the jury and may overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2011) (citing *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999)).

Here, several witnesses placed Alexander on the scene, Godina was viewed handing him a red bag with the bricks, when he was followed no one got in or out of his vehicle prior to the stop. R 437, 975:2-11. R 437 at 974:4-6. The red bag was removed from his vehicle, testing was conduct which indicated approximately 3 kilos of cocaine. R 438 at 211:10-12. Expert testimony indicated it was common for drug trafficking operations to sell cocaine by the kilo and use burner phones, similar to the one recovered at Alexander's detainment. R 441 at 1172:9-20, R 441 at 1166:1-7. Finally, both Ricardo and Godina testified that Alexander was used on

April 11, 201 as a drug couriers. R 437 at 873:8-25, 969:25, 970:1. Any challenge here is futile.

**FAILURE TO PROVE "KNOWINGLY"**

Similar to the analysis in Alexander's motion for an acquittal, any challenge to reasonable doubt would also fail. Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally *** to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S. Code § 841(a).

Here there is little question cocaine was seized from Alexander's Land Rover. R 438 at 211:10-12. The issue, as counsel sees it, is whether Alexander's possession of the substance was "knowingly or intentionally" as defined by the statute given the lack of any incriminating statements on his part.

First, it is well settled that 21 U.S. Code § 841(a) is a crime of general intent, not specific. See *U.S. v. Manganellis*, 864 F.2d 528, 539 (7th Cir. 1988). The intent required is not above or beyond that which can generally be inferred based on proof of the act in question. *Id*.

Here Alexander was observed taking a bag with three kilos, in exchange for a different bag with $80,000. R 440 at 554:19-25, 555:1. He engaged in a brief high-speed chase. R 241 at 153:9-15. And around the time the red bag was removed from the truck, it appeared he asked if he was being robbed. R 439 at 402:6-14. Finally, witnesses testimony stated Alexander was, at least on April 11, 2016, was a courier used by the organization to transport drugs. R 437 at 873:8-25, 969:25, 970:1.

Taken together, the knowing element can be inferred from the facts of this case. And any challenge to the contrary appears futile.

## II. INSUFFICIENT FACTS TO SHOW COURT'S ERRORS IN PRE OR POST TRIAL MOTIONS

### MOTION TO SUPRESS – NEW TESTIMONY & PROBABLY CAUSE

Any challenge to motion to suppress is futile, especially in light of Alexander's trial counsel agreeing to the *in limine* order. Both orders barred discussion of the motion to suppress and witnesses that failed to testify. R 391, 8. As counsel sees it, any complaint pertaining to trial testimony impact a previously ruled on motion to suppress is invited error. See *Int'l Travelers Cheque Co. v. BankAmerica Corp.,* 660 F.2d 215, 224 (7th Cir.1981) ("It is well settled law that a party cannot complain of errors which it has ... invited [or] induced the court to make.").

But the analysis cannot stop there, here the facts indicated Alexander was subject to a large sting operation, his sudden effort to flee authorities on April 11, 2016 trigged not only traffic violations but can be also viewed as extremely suspicious. R 241 at 153:9-15, R 436 at 63:19-25. As it's well settled that headlong flight—wherever it occurs—is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2009). Thus there was sufficient probably cause to detain Alexander.

And when probable cause exists involving a vehicle, the scope of the search can be fairly expansive. See *United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir.

2009) (holding that the officers' probable cause to search the defendant's vehicle encompassed the entire vehicle, including the glove compartment and trunk).

Here, a mere peek into the vehicle by Tyler Kazee show ever a red bag on the floorboard, apparently in nearly plain view of the drivers side door. R 241 at 203:1-6. Tyler retrieved the bag and peeked inside which revealed two packaged bricks and a cell phone. R 241 at 203:17-20. Nothing suggests any effort was made to hide this bag, and moreover, it was part of an exchange the Strike Force team had just witnessed. The stop, search, and seizure based on this fact pattern, make any challenge here futile.

**MOTION TO SEVER**

Next under Rule 14(a), the Court has authority to sever co-defendants' trials when "consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). A defendant who moves for severance must demonstrate that, absent severance, he is likely to be unable to obtain a fair trial. *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000); see also *United States v. Donovan*, 24 F.3d 908, 915 (7th Cir. 1994) ("The defendant's burden is to demonstrate 'severe prejudice' resulting from the district court's refusal to sever." (quoting *United States v. Curry*, 977 F.2d 1042, 1050 (7th Cir. 1992))). To meet his burden, the defendant must demonstrate that "there is a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "'In all but the most unusual circumstances, the risk of prejudice arising from a joint trial is

outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all.'" *United States v. Goodwin*, 496 F.3d 636, 644 (7th Cit. 2007) (quoting *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006)). A defendant is not entitled to severance "merely because [he] may have a better chance of acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540.

Alexander's argument was that the evidence against Defendant's Miller was far higher than his, and further, Miller "opened the door." But it doesn't offer much detail, perhaps because counsel filed the motion without the benefit of transcripts. R 421 at 2. However, virtually none of Miller's evidence implicated or involved Alexander. Although the motion complained of, or at least suggested Fentanyl was a more prejudicial substance to be charged with than Cocaine, no caselaw was proffered in support of this contention. And despite counsel's best efforts, he was unable to find any that would support this either. Moreover, jury instructions were issued directing the jury to decide the guilt of each defendant independently. R 441 a 1242:3-10, 1242:16-19, 1243:8-10. See *United States v. Van Wyhe*, 965 F.2d 528, 532 (7th Cir.1992) (jury presumed to follow cautionary instructions).

## III. NO ERRORS COULD BE FOUND PERTAINING TO SENTENCING

First, the Court determines whether the district court committed any procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation

from the Guidelines range. *United States v. Faulkner* , 885 F.3d 488, 498 (7th Cir. 2018) (quoting *United States v. Reyes Hernandez* , 624 F.3d 405, 409 (7th Cir. 2010)).

This Court reviews a district court's interpretation of law under a de novo standard and reviews factual findings for clear error. *United States v. Randy*, 81 F.3d 65, 68 (7th Cir.1996). "A factual determination is clearly erroneous only if, after considering all of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id*. at 762 (citations and internal quotation marks omitted). Where a defendant does not raise an objection in the court below, review is for plain error. *United States v. Liddell*, 543 F.3d 877, 883 (7th Cir. 2008). This Court will reverse for plain error only if there was error, it was plain, it affected the defendant's substantial rights, and whether correction is warranted in that it seriously affected the fairness, integrity or public reputation of a judicial proceeding. *Id.*

Here, the PSR, along with both the US Government and Alexander, correctly indicate his offense level at 34 and level IV criminal history. R. 126 at 38. He had two prior felony convictions involving drugs or a crime of violence, and it's presumed the Alexander is a career offender if, among other requirements, "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a).

**OTHER KEY SENTENCING POINTS WERE ALSO ADDRESSED**

The next inquiry is whether the court complied with Federal Rule of Criminal Procedure 32. Each of the critical provisions of the rule were complied with at certain points in the hearing, the record citations for which are noted below:

1) Rule 32(i)(1)(A). The court must verify the defendant and his counsel read and discussed the presentencing report (PSR) and any addendum to it. *See* R. 541 at 10:24-25, 11:1-7.

2) Rule 32(i)(1)(C). The court must allow the parties' attorneys an opportunity to comment on the PSR. *See* R 542 at 12:10-11.

3) Rule 32(i)(1)(C). For each objection to the PSR, the court must either rule on the objection or determine that a ruling is unnecessary. *See* R. 542 at 14:25, 15 at 1-8.

Second, "[i]f no procedural error is found, then the sentence is reviewed for substantive reasonableness"; we review the substantive reasonableness of a sentence for abuse of discretion. *Faulkner*, 885 F.3d at 498. "A sentence is substantively reasonable 'if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines, and arrives at a sentence that is objectively reasonable in light of the statutory factors and the individual circumstances of the case.' " *United States v. Patel* , 921 F.3d 663, 672 (7th Cir. 2019) (quoting *United States v. Rosen* , 726 F.3d 1017, 1027 (7th Cir. 2013) ). "[W]e presume that a within-Guidelines sentence is reasonable." *Id.*

Here the trial court went through the 3553 factors, and more pointedly, Alexander's counsel did not indicate one was missed or otherwise not elaborated on. R 542 at 53:1-10. The Court made a significant downward variance from the guidelines. R 542 at 49:8-15, 50:2-4. This appears to leave merely the issue of whether Counsel can show the trial court abused it's discretion when it didn't give *enough* of a downward variance. Based on the record presented, including defendant's prior convictions, any challenge here would be futile.

## CONCLUSION

There are no non-frivolous issues to raise on appeal in this case. Consequently, counsel requests that the Court grant the motion to withdraw.

s/ David Gotzh
CJA Counsel for Defendant-Appellant

David Gotzh #6298403
Counsel for Eugene Alexander
CJA Appellate Panel Appointment
332 S Michigan Ave, Ste 900
Chicago, Il 60604
t. 12.736.2975
e. David@MidwestAppeals.com

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the type-volume limitation of Circuit Rule 32.1(c) because it contains 7,539 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century Supra.

s/ David Gotzh
CJA Counsel for Defendant-Appellant

David Gotzh #6298403
Counsel for Eugene Alexander
CJA Appellate Panel Appointment
332 S Michigan Ave, Ste 900
Chicago, Il 60604
t. 12.736.2975
e. David@MidwestAppeals.com

**CERTIFICATE OF SERVICE**

The undersigned, counsel for Defendant-Appellant, hereby certifies that the foregoing document was filed and served via the Court's ECF notification system to all counsel of record.

s/ David Gotzh
CJA Counsel for Defendant-Appellant

David Gotzh #6298403
Counsel for Eugene Alexander
CJA Appellate Panel Appointment
332 S Michigan Ave, Ste 900
Chicago, Il 60604
t. 12.736.2975
e. David@MidwestAppeals.com

**CIRCUIT RULE 30(D) STATEMENT**

The undersigned hereby certifies that all of the materials required by parts (a) and (b) of Circuit Rule 30 are contained in the following appendix.

s/ David Gotzh
CJA Counsel for Defendant-Appellant

David Gotzh #6298403
Counsel for Eugene Alexander
CJA Appellate Panel Appointment
332 S Michigan Ave, Ste 900
Chicago, Il 60604
t. 12.736.2975
e. David@MidwestAppeals.com

SHORT APPENDIX

## SHORT APPENDIX TABLE OF CONTENTS

Denial of motion for acquittal........................................................................ A-01

Final judgment and commitment order ............................................................... A-55

Notice of appeal ............................................................................................. A-58

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 17CR319-3 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| EUGENE ALEXANDER, | ) | Chicago, Illinois |
| | ) | August 22, 2025 |
| Defendant. | ) | 1:00 PM |

TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE JOHN R. BLAKEY

APPEARANCES:

For the Government: HONORABLE ANDREW S. BOUTROS
UNITED STATES ATTORNEY
BY: MS. MEGAN DONOHUE
219 S. Dearborn Street
Chicago, Illinois 60604

For the Defendant: PISSETZKY LAW LLC
BY: MR. GAL PISSETZKY
35 E Wacker Drive, Suite 1980
Chicago, IL 60601

Court Reporter: KATHLEEN E. SEBASTIAN, CSR, RMR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 1212
Chicago, Illinois 60604
Telephone: (312) 582-3231
ksebastianrmr@gmail.com

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

COURTROOM DEPUTY: Calling Case 17CR319-3, the United States of America v. Alexander.

THE COURT: Afternoon, Counsel. Appearances.

MS. DONOHUE: Good afternoon, Your Honor. Megan Donohue on behalf of the United States.

MR. PISSETZKY: Good afternoon, Your Honor. Gal Pissetzky on behalf of Eugene Alexander who's here in court.

THE COURT: How are you doing, sir?

Defendant is present and in custody.

I've just been handed some letters. Those are new letters with regard to the sentencing?

MR. PISSETZKY: Yes, three short letters, in addition, three character letters that I received late, Your Honor, so...

THE COURT: Yeah. Yeah. We're not going to go forward with the sentencing until I read those. So we'll do it today, but I'm going to take a break and read the letters --

MR. PISSETZKY: Sure.

THE COURT: -- because I need to consider that.

Before we do that, though, I have a few housekeeping matters I think we could address. I'll take a short recess to review and consider the letters, and then we'll do sentencing.

How does that sound?

MR. PISSETZKY: Sounds great.

MS. DONOHUE: That's fine.

THE COURT: All right. Both sides ready to proceed on the sentencing, though, right?

MS. DONOHUE: Yes.

THE COURT: And there's objections. Do you intend on presenting evidence or -- with respect to the enhancement?

MS. DONOHUE: I do not, Your Honor, other -- we'll rely on the evidence that was presented at trial regarding the flight.

THE COURT: Okay. Are the parties ready to -- two things: There is a forfeiture allegation in the indictment that lists defendants; so technically it applies to this defendant. I did not see the parties discussing that. I'm assuming the government is dismissing the forfeiture allegation as to this defendant, correct?

MS. DONOHUE: Correct, Your Honor.

THE COURT: Is that your understanding?

MR. PISSETZKY: Yes, Your Honor.

THE COURT: Okay. That will be the order on motion of the government.

Any additional argument on the posttrial motions, 29 and 33? We did have a previous date. I indicated, based on our argument and the submissions last time, that I would issue a written finding, but when I went and looked at it, I didn't really think it required a written finding. So I'm prepared to rule unless somebody has something new or different that has

not already been put in writing or argued orally.

MS. DONOHUE: Nothing to add from the government.

MR. PISSETZKY: Nothing to add.

THE COURT: Okay. All right. The Court has considered the arguments of the parties and the motions and the written submissions including the reply filed by the defense.

Obviously, there's a very standard -- there's a very well-settled standard for the granting of those two motions both under Rule 29 and under Rule 33.

Motion for judgment of acquittal, of course, challenges the sufficiency of the evidence to sustain a guilty verdict against the defendant and the defendant faces a nearly insurmountable hurdle in contending that the jury had insufficient evidence to find him guilty. That's *United States versus Miller*, 782 F.3d 793.

Therefore, the Court -- both this Court and the appellate court have to afford great deference to the jury's verdict, their view of the evidence, which, when -- upon review, would be in the light most favorable to the jury's verdict and draw all reasonable inferences in the government's favor. And, of course, the Court, upon review, cannot reweigh the credibility of witnesses or reweigh the evidence.

The jury's verdict may be set aside, however, if there's insufficient evidence such that no rational trier of fact could have agreed with the jury.

I'll not cite the line of cases. Those standards are routine at this point.

As to Rule 33, a Court may, under the rule, grant a new trial if the interest of justice so requires. A new trial, in the interest of justice, however, has to involve the substantial rights of the defendant such that they have been jeopardized by errors or omissions during trial. And the granting of a new trial in the interest of justice is reserved -- and I am quoting -- *United States v. Coscia*, C-o-s-c-i-a, 4 F.Fourth 54 -- excuse me -- 454 -- that a granting of a new trial in the interest of justice is reserved for only the most extreme cases and the Courts have to approach such motions with great caution.

In this instance, the jury's verdict was supported by reliable and credible evidence. It had two cooperators who were cross-examined thoroughly. They testified credibly at least as to the material issues involved. There was also the testimony of several law enforcement officers who did testify credibly who participated in the surveillance of the defendant and other aspects including a stop, search, and seizure of drugs. There was also corroborating evidence by way of photographs and other things and physical items. There was also the drug trafficking expert, the chemist, and statements made by the defendant. All of that was put into evidence.

Certainly defense has argued -- referencing some

evidentiary -- the characterization is either as to discrepancies or false testimony, depending on how it's being argued.

The Court finds that there were no material discrepancies for the reasons that have been discussed in the record and in the pleadings of the parties and, even if there were minor or even material discrepancies, it was up for the jury to weigh those and assess the credibility.

All of the witnesses were subject to vigorous cross-examination by a talented attorney, in fact, two talented attorneys by the defense, and the jury was certainly entitled to credit that the way they did.

The Court has gone through it and cannot find a legal basis to undue the verdict as to either motion with respect to that theory.

Also, in terms of the defense argument that there was a failure beyond a reasonable doubt, I think that's undermined by the record. There's overwhelming evidence as to each element charged, which is consistent with the jury's verdict.

I think I've already addressed the cooperators. Yes, they were subject to cross and a cooperator's testimony is always valued or looked at with caution or great care.

Certainly I think the evidence as a whole supports the jury's verdict as a matter of law.

Government includes some references to defense

arguments that they believe were some attempt to incorporate by reference all objections made.

Obviously, undeveloped arguments are waived, and I'm not going to go chapter and verse on that.

Certainly the record speaks for itself when an issue is or is not preserved.

So, obviously, defense counsel preserved a lot of arguments and other ones were not. The record will speak for itself in that regard.

I have addressed the false testimony. I do not believe there was any violation there based on my observation of the proceedings, my having gone through my notes, and the materials from trial.

Also, there were two other arguments raised by the defense. One had to do with the motion to suppress, arguing that it was denied in error.

The Court incorporates by reference its prior findings. The motion to suppress was properly dealt with by the Court.

Same to the Court in dealing with the severance motion. That was not even a close call in this case. There was no error there. And, again, I incorporate by reference my findings there.

Is there anything else in terms of the issues that either the government or the defense believes requires further

treatment by the Court with respect to the two motions?

MS. DONOHUE: No, Your Honor.

MR. PISSETZKY: Your Honor, I know you mentioned the credibility of witnesses; however, we raised a very specific issue relating to the difference in the testimonies between two agents, the agent that testified at trial and the agent that testified during the motion to suppress, and how their testimony cannot stand if the Court believes one or the other. They just do not make sense in the way -- the way they testified.

They would have had to have been in the exact same spot and not know that the other existed in the same exact spot.

THE COURT: That's a mischaracterization of the record. I disagree with it.

And in terms of the trial, certainly, there was no secondary -- first or second witness, depending on how you characterize it, didn't testify at the trial. So it certainly didn't affect the trial, and there was -- the characterization of them being by their terms -- the conclusion you're drawing from the record is that, by definition, one of them is perjuring themselves, and that's simply not the case.

There's inconsistencies and apparent inconsistencies which are sometimes resolved by memory, sometimes resolved by different perspectives, the way questions are phrased.

I went through that allegation, and I just think it's revisionist history. It's not supported by the record.

Anything else, Counsel?

MR. PISSETZKY: No, Your Honor.

THE COURT: Okay. All right. I'm going to take a short break. I've got to read these letters, sir. So you can have a seat. I will be right back. Court's in recess.

MS. DONOHUE: Thank you.

COURTROOM DEPUTY: All rise.

(Recess at 1:16 p.m., until 1:22 p.m.)

THE COURT: Back on the record. Everyone is present.

For the record, I had an opportunity to review the letters that were recently submitted, and then there were two additional documents which my understanding is the government had to review as well.

One of those was a record from the Bureau of Prisons regarding defendant's services on a suicide watch. I've reviewed that. And then a certificate of completion regarding living with a medical condition. These are, look like, originals.

I have reviewed them if you want to take them back or see if you have to file them or however you see fit.

THE DEFENDANT: Thank you, Your Honor. I appreciate it.

THE COURT: And I'm also going to -- okay. Other than

that, anything else the parties think is part of the factual record?

MR. PISSETZKY: No.

MS. DONOHUE: No, Your Honor.

THE COURT: Okay. All right. Sir, this is your sentencing. If at any point during this process you don't understand what's happening or you simply want to talk privately with your attorney, all you have got to do is raise your hand. I'll give you as long as you need to talk with your attorney.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Before we begin I have to ask you a series of questions, make sure we are ready to go. When I do that, I'm going to place you under oath. So it's important that you give me truthful and complete answers to my questions because, since you're under oath, if you don't, you could be subjected to additional penalties for perjury and making a false statement.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Raise your right hand.

(Defendant sworn.)

THE COURT: Okay. Have you had an opportunity to review the posttrial motions and responses and replies, the

objections and the sentencing memorandum and the attachments filed by your counsel, the government's sentencing memorandum, the presentence investigation report, and the sentencing recommendation that's been provided to the parties?

Have you had an opportunity to go over all those materials in preparation for today's date?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with the legal representation and advice you've received in this case?

THE DEFENDANT: Yes.

THE COURT: Okay. In addition to the things I stated, the motion to suppress evidence, and the trial record, is there anything else the parties think is part of the factual record for sentencing that I have not mentioned?

On behalf of the government?

MS. DONOHUE: Your Honor, the only thing I would also point to would be the transcript of the hearing from those posttrial motions because I believe the flight was discussed and that the Court made a factual finding that there was a flight. So I would be relying on that as well.

THE COURT: Okay. Anything else?

MS. DONOHUE: No, Your Honor.

THE COURT: Anything else as part of the factual record for sentencing?

MR. PISSETZKY: No, Your Honor.

THE COURT: Okay. Any factual corrections to the PSR from the government?

MS. DONOHUE: No, Your Honor.

THE COURT: Any from the defense?

MR. PISSETZKY: Not aside from the ones that we raised in our memo.

THE COURT: Okay. I'm just talking about factual corrections.

MR. PISSETZKY: Right.

THE COURT: Is there any factual corrections?

MR. PISSETZKY: No.

THE COURT: Okay. As to the guidelines, I have two -- well, there's the objection in your motion regarding the 3C1.2 enhancement, and then there's an objection to Mandatory Supervised Release Condition 15.

Anything other than those that I need to address?

MR. PISSETZKY: Your Honor, there is a -- on paragraph 5, page 4, of the PSR, they are mentioning that there were two pretrial release violations that were filed.

I personally do not remember them. I do know that potentially there was something filed but nothing the Court, I don't believe, did anything on those violations.

Mr. Alexander's pretrial release was blemishless; so it had no blemishes at all. So I don't remember the --

THE COURT: It's on the docket. There are two -- if

you want to refer to them as pretrial reports.

MR. PISSETZKY: Okay.

THE COURT: I am aware of what they allege, and he's -- you know, he was on bond for a long period of time.

MR. PISSETZKY: Yes.

THE COURT: And was only taken into custody subsequent.

MR. PISSETZKY: Correct.

THE COURT: After the verdict so --

MR. PISSETZKY: I just raised it because, you know, the way it was characterized, I wanted to make sure that we know that it was not something that the Court acted on or revoked or sanctioned my client.

THE COURT: Do you think it's something that -- if there's something factually incorrect in that paragraph, I'm happy to address it. It's paragraph 5 of Docket Entry 500.

Everything you've just mentioned, though, is reflected on the docket because the reports are on the docket and what they say is on the docket and his conditions of release over the course of the proceeding is all self-evident.

If there's something -- I am aware of the record.

MR. PISSETZKY: Yeah.

THE COURT: So I'm not going to be misled if you think it's not so much a question of factual correctness or something else. It's up to you.

Do you think we have to make any factual corrections to paragraph 5?

MR. PISSETZKY: I just don't like the word "violations." That's what I -- I think what Your Honor said, you characterize it as a pretrial report.

THE COURT: All right. Any objection to changing the "violation" to "pretrial report"? The contents of those reports is in the docket.

MS. DONOHUE: I hate to make a big issue of this, Your Honor, and certainly I'll defer to the Court's opinion, but it's my understanding in 2017 and 2019 he did violate the terms of his pretrial release and that probation subsequently filed those reports.

I have no reason to doubt pretrial's accuracy in terms of the reports that were filed or the fact that they determined that his pretrial release was violated. I certainly can appreciate that, other than those two, there seem to have been no violations, but I think they were violations and that's separate and apart from, you know, any subsequent action that was taken in this case. There was, you know, from what I can see, no admonishment, no hearing, et cetera.

THE COURT: His bond was revoked as a result of the verdict, not as a result of a violation.

MR. PISSETZKY: Correct.

THE COURT: So -- and there's no request to change the

words due to noncompliance with location monitoring, which was the issue, and the content of those reports stand.

So over objection, I'm going to grant the correction and instead of saying "violation" in paragraph 5, it will say "pretrial reports." And then the reports speak for themselves, and I'm not making any changes to the reports themselves.

Other than that factual change, anything else to the PSR and attachments?

MR. PISSETZKY: No, Your Honor.

THE COURT: Okay. The Court is going to treat those matters then as undisputed portions of the record for purposes of sentencing.

Does the government have any objection or correction either to the guideline calculation or the citations to the sentencing statutes as listed in the presentence investigation report?

MS. DONOHUE: No, Your Honor.

THE COURT: Other than the obstruction for the flight, the two-level enhancement, and the condition -- is it Discretionary 15 or is it Special 15?

MR. PISSETZKY: Special 15.

THE COURT: Special 15. Other than those two things that the Court needs to address on behalf of the defense?

MR. PISSETZKY: No, Your Honor.

We did raise an official -- what the guidelines still

call an official departure relating to the criminal history.

THE COURT: Yeah, the -- well, I deem that as a request for a variance rather than a departure.

MR. PISSETZKY: Right.

THE COURT: And the government is also asking for a variance.

So it was my intention to address that by way of the 3553 factors. How does that sound?

MR. PISSETZKY: Sounds good.

THE COURT: Okay. All right. Any argument -- it's the government's burden on the obstruction of justice enhancement under 3C1.2. Any argument?

MS. DONOHUE: Sure, Your Honor. Obviously, our position is that probation correctly added that enhancement. Contrary to what's stated in defendant's brief, there was plenty of evidence at trial that defendant knew the police were behind him when he left the deal on April 11th.

Specifically, Co-Defendant Castaneda testified that he observed a vehicle following defendant from the scene, that he texted defendant, asking if that vehicle was with defendant. Defendant then texted him back saying, no, at which point defendant proceeded later on to lead officers on this high-speed chase.

There was testimony from, I believe, at least three separate law enforcement officers about the right that

defendant took, about the fact that he was traveling through a residential neighborhood, about the fact that he was driving at a high rate of speed and disobeying traffic laws.

Additionally, there was further testimony regarding defendant's flight at the suppression hearing, and this issue was again raised in the hearing on the posttrial motions.

So I think there is sufficient evidence --

THE COURT: And what from that hearing you think is relevant to the enhancement? What portions?

MS. DONOHUE: The fact that defendant's flight created a substantial risk of harm not only to the law enforcement officers that were trailing him but also to civilians in the area and that easily someone could have been injured by this flight. It may not have been long, but it certainly went on for several blocks and clearly created a substantial risk of harm or had a potential, I should say, to create a substantial risk of harm.

THE COURT: Okay. On behalf of the defense.

MR. PISSETZKY: Your Honor, actually the testimony during the motion to suppress was more detailed than the testimony at trial regarding what occurred because that was the crux of the motion to suppress.

And during that motion to suppress, I believe it was pretty clear that the officers -- and I know that there was a long discussion about the way that the vehicles -- the

undercover vehicles appeared and the way that the officers appeared, and there's no question that the officers -- because I think we saw pictures of it -- were all dressed in civilian clothes, but, more importantly, the cars, especially the -- specifically the undercover vehicle that was following Mr. Alexander's car was also -- did not have any visible lights.

And I remember even the Court asked the question about where exactly were the lights that eventually were turned on at some point. And they were hidden in, I think, either -- in the -- somewhere around the dashboard or in the -- they were not visible if they were not on.

And so it is -- and the way that the officers proceeded to pull Mr. Alexander out of the car, again, with civilian clothes and then just let him go after, what we heard on trial, they went into the car and took a red bag and then let Mr. Alexander go.

Throughout that time Mr. Alexander did not know or believe that they were police officers, and that was the testimony or that was the -- what came out during the motion to suppress, that there was -- that there was a question of whether or not they were really the police officers that were going to -- that were stopping him.

In addition, there was absolutely no testimony that there were any civilians and that Mr. Alexander put anybody in

danger during that time.

We do know that he made the left turn at a stop light -- at a stop sign after he was almost boxed in or the undercover police unmarked car came around him and he made a left turn.

But from there, we didn't hear testimony -- aside from a potentially high rate of speed, we did not hear any testimony of any other violations of traffic offenses or that there were any pedestrian or anybody else that might have been in danger at the time.

THE COURT: Okay. Point of clarification. Both parties are in agreement, I believe, that in light of the career offender enhancement that even if the Court makes an error on the 3C1.2 two-level enhancement that essentially it comes out in the wash at the end of the guideline calculation, correct?

MS. DONOHUE: Correct.

MR. PISSETZKY: Correct, Your Honor.

THE COURT: Okay. The Court has reviewed the record. The facts underlying the proposed enhancement are undisputed.

The inferences to draw with respect to not necessarily his conduct but his state of mind -- there are competing inferences which are in dispute, and that relates most specifically to whether the defendant knew he was being -- prior to the Mars lights being activated, did defendant know

that he was being followed by the police as opposed to some other person who was interested in the drugs, et cetera.

I'm not faulting the government for its theory or probation for its application of the enhancement, and, obviously, the standard is preponderance for the enhancement. But I believe there's sufficient conflict in the record. I'm going to grant that objection and not apply the two-level enhancement of paragraph 19 and wherever else it appears in the presentence investigation report.

Any -- any other objections or revisions to the guideline calculation or the sentencing options by statute set forth in the presentence investigation report from the defense?

MR. PISSETZKY: No, Your Honor.

THE COURT: Okay. The Court will adopt the guideline calculation with a ruling from today as to paragraph 9. That results in a total offense level of 34 -- and please listen carefully to make sure I don't misstate these, everybody -- a total offense level of 34 and his criminal history category, Cat III -- Category III, goes up to a Category VI. So it's a Total Offense Level 34 --

COURTROOM DEPUTY: I'm going to cut you off, Judge. Wouldn't it be 32 because you didn't impose the two-level enhancement?

THE COURT: No.

COURTROOM DEPUTY: You are getting there?

THE COURT: Thank you for checking, even if the checking is not right. I love people checking it.

MR. PISSETZKY: I agree with her.

THE COURT: The career offender enhancement makes the base offense level go to 34. So it's a total offense level of 34, Category VI, which is guideline imprisonment range of 262 to 327 months.

There's a five-year mandatory minimum.

There's a term of supervised release of at least four years. The guideline provision for supervised release is four years.

Defendant is not eligible for probation by statute. Obviously, it's not either by the guidelines.

The maximum fine is $5 million.

The $100 assessment is mandatory, and the guideline fine, for a range, is 35,000 up to $5 million.

There's no forfeiture because that's been dismissed. And restitution is not at issue.

Did I state everything correctly, government?

MS. DONOHUE: Correct.

THE COURT: Defense?

MR. PISSETZKY: Yes.

THE COURT: Okay. All right. That's going to be the calculation.

Okay. Mr. Alexander, even when the guideline is not

disputed -- we had one dispute; I ruled in your favor.

Even when it's not in dispute, I have to calculate it correctly under the law, right?

And I have to know what my sentencing options are. That's why we go through that whole process, including some of those numbers that are not pleasant to hear. So I understand that.

What we are going to do next is called the 3553 factors where the Court listens to the government, your attorney, and ultimately you get a chance to speak as well.

And that's in addition to everything else that's been provided to me prior to today's date, including all the materials I talked about.

So when we do that, I'll try to impose a sentence that is sufficient, but not greater than necessary, to accomplish the purposes of sentence. So that's a really important part of the sentencing.

Do you have any questions for me before we start that part of the sentencing?

MR. PISSETZKY: Ask me first.

THE COURT: Okay. Why don't you have a moment with your client, see if there's anything else we need to clarify.

MR. PISSETZKY: My client had a question about the career offender. I explained to him that Your Honor is going to consider that during the 3553 arguments.

THE COURT: Yes. Okay. The guidelines are not mandatory. They are advisory, right?

So -- and your attorney has made arguments in his papers, and I'm assuming he's going to make additional ones today, that the guideline range, because of the career enhancement, it should be the subject of a variance which is a downward variance from that guideline range.

The government is also asking to come down from that guideline range. Not as much as your attorney.

So both sides are asking for a downward variance, which means that's what the guideline is. It's correct under the law, but your sentence should be less than that.

So everyone is going to argue that. So there's a lot of reasons for that. So that's what that 3553 process we talk about is, all the things that transcend the offense in this case because it talks about a lot of different things, including the age of those convictions, a bunch of things. Okay?

THE DEFENDANT: Okay.

THE COURT: Anything else you want me to explain before we start that part of the sentencing?

THE DEFENDANT: No.

THE COURT: Okay. Government, 3553 factors?

MS. DONOHUE: Yes, Your Honor. I would like to focus specifically on the nature of the offense as well as

Mr. Alexander's history and characteristics.

I think it's important, when we turn to the nature of this offense, that we look at -- not only at the three kilograms of cocaine that he purchased on April 11th but also his extensive prior activity with the specific drug-trafficking organization.

Defendant was not a one-time customer. This was not a one-off event. Defendant was a long-term and regular customer of the DTO, buying distribution-level quantities on a routine basis.

On April 11th specifically he bought three kilograms of cocaine. As our drug expert testified at trial, this is an immense amount of cocaine, not a personal use quantity.

Here defendant had three kilograms which amounts to over 30,000 personal amounts. He, obviously, was not buying that cocaine for personal use. He was buying it to sell it to others. And he had done it before; dated back to 2012.

In addition to his extensive narcotics activity, I would submit, again, that the government's position, as borne out from the testimony at trial and at the suppression hearing, is that defendant did flee on April 11th after purchasing that cocaine.

Regardless of what type of clothes the law enforcement officers were wearing or what cars they were in, Co-Defendant Castaneda notified the defendant that a car was following him.

As soon as lights were activated, defendant took off at a high rate of speed in a residential neighborhood.

So the government continues to argue that he created a substantial risk of death or serious bodily injury.

Turning to defendant's history and characteristics, as outlined in the presentence report, defendant has been arrested numerous times and has two prior felony convictions: For attempted murder in 1994 and possession of cocaine with the intent to deliver in 1995.

These convictions, as Your Honor already noted, are old for sure, but they are serious, particularly the attempted murder conviction for which defendant received a 30-year sentence.

As noted in our sentencing brief, this attempted murder involved firing shots at three people in a car, one of whom was an infant.

So defendant's criminal history, while old, qualifies him as a career offender, which is what makes his guideline range particularly high, but certainly that categorization is warranted, given his prior convictions.

Despite that, the government certainly recognizes that his criminal activity has slowed over the years.

The government commends him for getting his life back on track. It is clear from the PSR and the letters that were submitted that he has a lot of family support, and that is why

the government is recommending a below-guidelines sentence.

Finally, I just want to speak to defendant's contention that sentencing him to what the government recommends, as 210 months, would create unwarranted sentencing disparities.

The co-defendants who have already been sentenced received less than 210 months because they pled guilty prior to trial, accepted responsibility, cooperated, and also their criminal histories were less serious than defendant's. Neither was a career offender, and both had a criminal history category of III, unlike defendant in this case who, as we discussed, has one of VI.

So for all those reasons, the government requests that defendant receive a sentence of 210 months, which is well below the 262 low end of the guidelines range.

THE COURT: Thank you, Counsel.

On behalf of defense.

MR. PISSETZKY: Thank you, Your Honor.

So I guess I'm going to start as well at the nature and circumstances of the offense.

The government -- and certainly Your Honor noticed and knows that 3553 factors are more the nature and circumstances of the offense for the criminal history of an individual which is the two things that the government -- the only two things the government argued.

So not taking away from the seriousness of the offense, which was 2.9 kilos -- the government characterizes it as three kilos, I guess. Not a big difference. But it lands him, as the guidelines recommends, at 26 months, which is Level 26 which is 78 to 97 months.

Now, the government argues that Your Honor needs to take into consideration that Mr. Alexander was dealing with the DTO since 2012 and was dealing with larger amounts of cocaine and distributing cocaine.

The interesting thing is that that's not what the jury convicted Mr. Alexander of.

It is not, as we can see with the presentence investigation report. And I have not heard the government argue that it's relevant conduct, despite the fact that he was dealing with a DTO.

And the reasons why it was not relevant conduct and the reason why it is not in the PSR and the reason why he was not charged with it is because the only, I guess -- I'm not sure to call it evidence. But the only evidence that the government was able to provide to the jury or otherwise is the word of Mr. Castaneda and somewhat of Mr. Godina.

But Mr. Castaneda, if you remember, did not take any responsibility on himself during the trial. He blamed everything on his brother: My brother did this; my brother told me to do this; I don't know how to do it; I didn't know

how to do it; I was not really running the show; it was my brother that was running the show; and, by the way, my brother also dealt with Mr. Alexander since 2012, and Mr. Alexander was dealing with my brother; I don't know much about it, but my brother can tell you more about it.

But guess what? The brother is not here and the brother didn't testify, and the government certainly does not have any evidence whatsoever because you heard from the agents --

THE COURT: Isn't it true that, in the presentence investigation report, the relevant conduct is just what he was convicted of, not the -- there wasn't a conspiracy count that held him accountable for mult -- beyond the count of conviction, right?

MR. PISSETZKY: That's exactly what I am saying.

THE COURT: The government has agreed to the guideline calculation and the relevant conduct.

So they are not arguing that he should be held accountable for some other drugs, right?

MR. PISSETZKY: No, they are not, but they are asking that Your Honor give him a higher sentence because of that.

THE COURT: Okay. Well, it's not part of the relevant conduct. Go ahead.

MR. PISSETZKY: Yeah. So they are saying you should punish him for conduct that they claim was provided to the

Court through Castaneda and Godina, but it's not relevant conduct.

So that's what they are saying. They're saying, oh, he was dealing since 2012 with a lot more than the three kilos that he was charged with and, therefore, you should give him 210 months, rather than what we're asking or very below the 210 months.

THE COURT: There's nothing in the trial record that would allow the Court to ascertain an amount under that theory with any precision, right?

MR. PISSETZKY: Absolutely.

THE COURT: Okay.

MR. PISSETZKY: And that's my argument. The government's argument cannot stand, as far as my client's nature of the offense, to tag on this imaginary amount of drugs and say he has been dealing with the DTO since 2012 and, therefore, Your Honor should punish him more severely because of that.

The jury convicted him, and that's what Your Honor is looking at, and there is no relevant conduct of 2.9 kilos, which, if he was not a career offender, would have put him at a level of 26 with criminal history of III which is 78 to 97 months. And that's what he would have been but for that career offender calculation.

And so let's talk about the next issue, I guess, is

what the government brought up, which is his criminal history.

The government does not -- did not talk at all, but I will, about his actual history. They talked about his criminal history.

His criminal history is -- since -- is from the time that he was -- and Mr. Alexander was arrested and had issues with the law when he was 15 until he was 19, when he was a teenager, 15 to 19. He was a teenager.

There are -- and I didn't cite to them in my sentencing memorandum, but I'm sure Your Honor has seen them and heard them. There's plenty of research today that says that people younger than the age of at least 24 have not had -- have not developed -- their brain is not fully developed and they are still developing, and there is a policy statement in the guidelines that indicates that and allows for and suggests for a variance downward because of that issue.

Now, I'm not asking for that variance because of that issue, but I'm asking that Your Honor consider that my client was very young at the time and that the offenses that were committed back in 1992 and '93 -- I believe the convictions were in '94 and '95, but the offenses were committed before that -- overstate the seriousness of my client's criminal history or -- and that's what the guidelines say -- or the likelihood that he will commit other crimes at this point.

And I think that that would lead me to -- it's a very

good way of leading to the next argument because it is specifically -- Your Honor specifically has to look at the likelihood that my client will commit other offenses or other crimes in the future, which goes into other factors in the 3553 statute that calls for whether or not he needs to be deterred and how badly he needs to be deterred and whether or not there are other ways to need to provide restitution to any victims, whether or not there is need for educational, vocational training, medical, or other correctional treatment in this matter, rehabilitation, and to protect the public from defendant and such.

And when you look at Mr. Alexander, this particular offense occurred in 2016 -- '17. He was arrested on September 14, 2017.

The offense itself happened in 20- -- a year before in April.

It's important to note that, when Mr. -- when the police say they saw Mr. Alexander in April of 2016, they have not seen him or heard of him prior to that day, and we have plenty of phone records that were tendered in this case from various phones and various text messages, and none of it has anything to do with Mr. Alexander, and the officers were very candid when they said that they had no idea who Mr. Alexander was.

And then when Mr. Alexander was arrested in 2017, he

was released on pretrial release.

And usually cases don't stick around for so many years before they go to trial, but this case did, while Mr. Alexander was on pretrial release. It stuck around for approximately eight years.

And aside from these two reports by probation, which I don't know if he, in fact, went outside the electronic monitoring, but the matter of fact is that that electronic monitoring was removed by the Court because Mr. Alexander was in full compliance of his pretrial release.

And not only was he in full compliance, he has started to do good in the community. And I know that you have some letters about it. But he completely made a change in his life to give back to the community.

He was working as a driver for the elderly and for other people that need medical help and would drive them to their medical appointments, to their dialysis, to the hospital and, in fact, became so close with them that he would help them otherwise.

And Mr. Alexander has done it for quite some time when he was on pretrial release, and I think that says a lot about an individual because it's not one or two years; it's not a short period of time on pretrial that somebody is doing it, and maybe it indicates that he wants to do it to show the Court that maybe something is happening.

Mr. Alexander has been out for a very long time. He was out for approximately eight years. And that's not a short period of time. And that's what his life is now about.

His life is about the community. You see the support that he has here in court today of all the people that are behind him.

Some of these folks did write letters. Some of them did not write letters. But they are all -- this is the community. They are all behind Mr. Alexander because he is a good person.

And we provided the Court a report from the BOP relating to what Mr. Alexander is doing at the MCC now.

How often have you seen this before you from people that come -- that come before you to be sentenced and were housed in the MCC for just about a year?

He has no tickets. He has no complaints. He, in fact, has continued to do what he has been doing on the outside, and that is helping people, giving back to the community, wholly committed to providing the community and rehabilitating himself, helping now people at the MCC at suicide watch, working as a counselor for people, talking to them, and assisting the MCC when there's somebody that is in need.

This is who Mr. Alexander is. He grew up raised by his mother. His father died early also when Mr. Alexander was

young. He was raised poor, but his mom did the best.

He had an uncle that abused him; so his mother moved and eventually remarried a person who became like a father figure to Mr. Alexander.

Unfortunately, within a span of a few years, Mr. Alexander lost his mother, his stepfather, his uncle, and his grandma all to cancer, and that has just happened in the last five years or so.

Yet he has remained strong and remained committed to helping the community, to helping his family.

His wonderful wife is here in court. His children are in court, his stepdaughter, his granddaughter. He has a family.

Mr. Alexander is not a young man anymore. He was maybe when those original charges came about when he was 19, but he is 52 years old today.

We are asking for 60 months, Your Honor, and if Your Honor provides and gives Mr. Alexander 60 months, which we believe is a substantial sentence in light of the allegations because of who Mr. Alexander showed the Court that he truly is -- it's still a long sentence, and the recidivism rate for an individual like Mr. Alexander and for Mr. Alexander, based on the example that he already has shown the Court, is that he will never be back here before this Court or any other Court whatsoever.

I know counsel says that Mr. Godina -- when you look at unwarranted sentences, that Mr. Godina and Mr. Castaneda got respectively 120 months and 146 months because they didn't have that criminal history and they cooperated and pled guilty.

You know, I understand that people plead guilty and automatically, by guidelines, they receive the three point of acceptance of responsibility and, when somebody cooperates, they get additional points. That is the nature of our beast, I guess.

That does not mean that Mr. Alexander needs to receive a sentence higher to them or equal to them because he was a lot less culpable than them.

They cooperated because their drug dealings was, admittedly, a whole lot more egregious than Mr. Alexander.

Admittedly, they dealt with a huge number of kilograms of cocaine and heroin and other drugs.

And so when you look at -- in perspective and to look at unwarranted sentences, Mr. Alexander is charged with three kilos, just under three kilos of cocaine. He should not receive a sentence that is anywhere near the 120 months or 146 months as they are, and as the guidelines indicate, a sentence for Mr. Alexander with his criminal history, but for the career offender, is 78 to 97 months.

And so with Mr. Alexander's -- the fact that his characteristic, his personal characteristic, the fact that he

is pretty much fully rehabilitated, the fact that he is giving back to the community at this point, you will not see him here again, Your Honor, we believe that a sentence of 60 months is a sentence that is appropriate in this case and any sentence anywhere close to the career offender guidelines is just egregious.

THE COURT: Do you need to respond to that, Counsel?

MS. DONOHUE: I would love to, Your Honor, just briefly.

First, with respect to the amount, there seems to be an allegation that, by saying three kilos, I am speaking out of turn. It was 2.994, to be exact. And I think the essential point is that this was a ton of cocaine, defendant intended to distribute it, it was enough cocaine that five years is the absolutely mandatory minimum that he should receive for the sentence.

With respect to the fact that his prior and extensive drug dealing activity should not be considered, I would argue -- and I'm not asking, as Mr. Pissetzky suggests, to tag him with a specific amount of drugs.

Certainly, you know, evidence was not presented to tag him with a number over the three kilograms that we did present, but I think it's certainly relevant when you consider the context of this particular drug deal as well as Mr. Alexander's background.

So I am asking the Court to just consider the grand testimony that Mr. Alexander was a regular customer of the drug trafficking organization and that this was not his first deal.

With respect to his criminal history, plain and simple, he is a career offender. He has these two serious felony convictions.

And I understand Mr. Pissetzky's point that he was 15 or 19, he says, when this conduct occurred, but the conduct at issue occurred at 2016. So he was certainly older at that point in time. And I think it's important to consider that, when we think about his repeated activity and the fact that, despite the nature of those convictions and despite his convictions for those 1994 and 1995 crimes, that he, obviously, was not dissuaded from engaging in this significant drug deal in 2016.

Finally, with respect to the sentencing disparities, Mr. Pissetzky alleges that, you know, since Mr. Alexander didn't cooperate, that doesn't mean he should receive a higher sentence. But it also doesn't mean he should get a lower sentence, especially considering we went to trial and his guidelines are what they are.

So for all those reasons, the government maintains its position that he should be sentenced for 210 months.

THE COURT: Thank you, Counsel.

Anything from probation?

PROBATION OFFICER: Good afternoon, Your Honor. Kathy Kiriklakis here for Officer Craig Boudy who's out of the office.

THE COURT: Thank you. I wasn't sure that I got your appearance. I just wanted to make sure.

PROBATION OFFICER: Yeah. I just wanted to let the Court and the parties know we'll do a corrected PSI, making changes to paragraph 5 and a statement of correction with regard to the obstruction issue.

THE COURT: Thank you.

PROBATION OFFICER: I have nothing to add right now. There might be some questions when we talk about supervised release.

THE COURT: Okay. As to supervised release, there's an objection to the proposed Special Condition 15. So let me ask both parties: Other than that objection, which was raised by the defense in the papers, is there any other objection to the proposed term and conditions of the supervised release as set forth in the PSR, Docket Entry 500, pages 14 through 20?

On behalf of the government?

MS. DONOHUE: No, Your Honor. I believe that the defense had one additional objection.

THE COURT: On behalf of the defense?

Take a look at those, see if -- other than Special 15, if there's anything the Court needs to hear from the parties.

MR. PISSETZKY: Yeah. Other than that special condition, Your Honor, we don't.

THE COURT: All right. Government did not take a position with it.

Are the parties in agreement that Special 15, as a technical matter, would be covered by Mandatory 1? If, in fact, he is or is not in violation of that statute, that would still be covered by, you know, "You shall not commit any federal, state, or local crime. So isn't Special 15, at a minimum, redundant and should be stricken?

MR. PISSETZKY: I agree, Your Honor. I don't think there needs to be a special condition for that because our position is that he does not need to register anymore because those ten years have gone by and there's no other requirement for him to continue to register. So I agree with Your Honor.

THE COURT: And if the government thought he was in violation of that, which they have not asserted, they could pursue under Mandatory 1, correct?

MR. PISSETZKY: Sure.

THE COURT: And then I could make the legal determination.

But at this point, is the government's position different from what your papers are?

MS. DONOHUE: No. That's fine, Your Honor.

THE COURT: All right. Anything from probation on

that?

PROBATION OFFICER: Your Honor, I checked with our supervisor, and the recommendation was based on some of the documentation that the defendant was signing and filling out to register. The language made it appear as if it was life.

We would defer to the Court.

So -- but if it did expire in 2020, they were still having him register as late as 2022.

So we would defer to the Court that it would -- if it is an issue and he does still need to register for some reason, that it would fall under Condition 1, as the Court mentioned.

THE COURT: I'm not disagreeing with probation in that respect, but certainly, if the government is going to pursue it, then they are going to have to pursue it. And then I can have the advantages of the adversarial system about whether or not he is or is not in compliance with that.

And I believe, based on my review and what I've heard today, that if, in fact, he is in violation of that, the government would be totally authorized to pursue it at some point in the future upon release in the beginning of supervised release based on Mandatory Condition 1. So I'm not saying you guys did anything wrong, but I'm going to sustain that objection when I start discussing those factors.

Anything else on behalf of either side before I hear from the defendant as to 3553?

Government?

MS. DONOHUE: No, thank you, Your Honor.

THE COURT: Okay.

MR. PISSETZKY: No, Your Honor.

THE COURT: Sir, you don't have to say anything, but it is your right to do so. If you wanted to say anything before the Court imposes sentence, now is the time.

And if you want to read, that's okay, but make sure you keep your voice up and take your time.

THE DEFENDANT: Okay.

THE COURT: Sometimes people get nervous and talk too fast and the court reporter has got to take down everything you say. So please, sir, take your time if you want to read.

THE DEFENDANT: All right. Thank you.

All right. Honorable Judge Blakey, Your Honor, first I want to thank you for overseeing this case and ensuring that I received a fair trial. I also want to express my respect for the Court. I understand the seriousness of the charges against me, and I accepted the jury's verdict.

Although I have been in prison before, I want the Court to know that I am not a bad person. I came from poverty, and I have struggled my whole life, but I have always worked to provide for my family and to live a better life.

I am married to a wonderful woman, a father of three amazing children and one beautiful granddaughter. I love my

family deeply. I know I have made mistakes, but I also know I can do better. I have always maintained good employment. And once I am released, I plan to return to work with my wife in her transportation company.

Her business provides a service to the sick and elderly, offering rides to doctor appointments, chemotherapy and dialysis treatments. This work is meaningful to me because I have seen firsthand the struggles of illness.

Since I have been charged with this case, my mom, my dad, and my uncle all passed away from cancer. These losses have inspired me to give back.

While incarcerated the past 14 months, awaiting sentencing, I have volunteered as a suicide companion in the MA watch, helping others who were struggling.

I want to continue helping people in any way I can.

I am grateful for the support of my loving family who has stood by me through this difficult time with their encouragement.

I am committed to living a better life, making responsible choices and being a positive influence on my children, grandchild, and my community.

Your Honor, I humbly ask you to not only consider my past but to consider my current efforts and the support system I have in place.

I want the opportunity to continue to grow as a

responsible husband, father, and member of society.

Thank you for your time in allowing me to speak to the Court.

THE COURT: Thank you, sir.

The Court has considered the 3553 factors to fashion a sentence that is sufficient, but not greater than necessary, to accomplish the purposes of sentencing. That's the mission statement I receive from Congress in this case and every case.

As part of that process, I've considered the nature and circumstances of this offense, I've considered the history and characteristics of the defendant and the need for the sentence imposed not only to reflect the seriousness of the offense and promote respect for law, provide just punishment and afford adequate deterrence to the degree it is relevant here, and it is not as pronounced perhaps as other cases in light of your good conduct on bond but still present.

I've also considered the need to protect the public from the potential of future crimes.

This isn't your first time in the criminal justice system, and prior instances did not deter you. So the risk of recidivism is not nonexistent. It's present, and it's properly measured. This Court will properly measure it.

I have considered the kinds of sentences that are available. I have considered the guideline sentence range.

There was only one dispute, which I resolved in your

favor, but having considered the 3553 factors and the position of both sides that I should depart downward from the guideline range of 262 to 327 months, even if I made a guideline error -- for example, let's say I was wrong to grant your objection to that enhancement; it doesn't make a difference at the end of the day.

The variance under the 3553 factors, including factors that relate to undisputed portions of the record including the need to reflect the seriousness -- to protect -- excuse me -- to promote respect for the law and nature and history and characteristics of the defendant, those factors are not related to the guideline disputes that were involved.

And the variance -- downward variance that the Court intends to impose will reflect the factual matters and the mitigating arguments that your counsel has had. So ultimately the guideline was not affected by the total adjusted offense level.

So even if I made an error ruling in your favor on the enhancement, the error would be harmless for that purpose. So I'll just note that for the record.

By way of mitigation, I've considered the letters that were submitted on your behalf. I've considered the age of the -- not only your age when you committed your prior offenses but the age of them themselves, the fact that they are remote in time and, while some of that remoteness is reflected by the

fact you received long prison sentences in the past, there's also long periods of time where you were not in custody, and the only things that are present, other than your prior convictions, which are not in dispute, and the circumstances of this offense, which, again, are -- were disputed for purposes of trial but not here today for the purposes of sentencing -- there are long stretches of time, especially while you have been on bond, where you have not engaged in criminal activity.

So while the career offender enhancement was appropriate to apply and the guideline was properly calculated, the guidelines are advisory for a reason.

The Court needs to put that into context, and people are not subject to mathematical formulas. So the Court does intend to downward depart dramatically from the guideline range.

I've considered, as I said, your conduct on pretrial release. It wasn't perfect. There were a couple issues with electronic monitoring.

But you were on bond for a long time, and there's a lot of reasons why this case was charged when it was and it's sentencing now and it is one of the oldest cases that's ever been on my docket. So there's a lot of reasons for its age.

But one of the things that is at least an advantage to the defendant on that score is the fact that there's a track record now that the Court gets to look at.

Of course, you were engaged in that track record of not committing new offenses while you were awaiting this day, both your -- the verdict at trial and the sentence today, but it does allow the Court to have more information.

A lot of times a person will be charged, convicted, and I'll have to make guesses about what might happen in the future. That's a really difficult process.

So while no one likes to be on pretrial release for any period of time, the fact that you were on pretrial release and there were -- like I said, it wasn't perfect, but there were long periods of times with no new offenses that mitigates the recidivism risk and the need for specific deterrence.

So those are mitigating factors.

I've considered your efforts to help the community that were noted in the materials, and your counsel talked about those; your efforts to rehabilitate yourself while in custody and before being taken into custody; your health issues. I've considered the letters that were in support, and I've considered your family needs and their support.

That's a two-sided coin. Your family needs you in their lives. So that's a mitigating factor. And also you need them in yours to help prevent you from ever standing in front of a judge ever again in your life.

You did it when you were a young man, and you did it for very serious offenses. And I'll talk about aggravation in

a moment because you were not writing on a blank slate when you decided to commit the offenses in this case. But you need that family to help you make that transition from custody to out of custody.

So that's a mitigating factor and hopefully a factor that will reduce the risk that you're going to harm the community again as you had time and time again.

Counsel, have I addressed your arguments in mitigation?

MR. PISSETZKY: Yes, Your Honor.

THE COURT: Okay. By way of aggravation -- and this is both aggravation and mitigation. Let me sort of qualify a few things.

I've considered relative culpability. The co-defendants received specific sentences. I have considered them. I considered the records there.

The defendants are not similarly situated. The government indicates, obviously, when a person cooperates, they get less; when a person has different criminal history, they get less.

But as defense counsel indicated, they had different roles in the offenses and those individuals had more serious roles in the offense conduct that was established for the record here.

So relative culpability is something the Court needs

to take into account. Sometimes it's not purely aggravating; sometimes it's mitigating; sometimes both, as it is in this case.

A variety of arrests were noted, and there's nothing wrong with noting them, but the Court has not placed any weight on a mere arrest.

You are presumed innocent of those charges. And no facts have been presented to me to establish that something happened or didn't happen. So while there's nothing wrong with the argument, I place zero weight on arrests that didn't result in anything or evidence wasn't submitted to support anything.

Likewise, the notion that this is not your first deal, while it's technically true because you have a conviction back in the '90s, so I guess you had a prior deal, but a comment by a cooperator on the stand is something the Court needs to -- while they testified credibly as to material issues, certainly I have to -- just as the jury does, I have to consider that testimony with caution and great care, and there's been no evidence presented that -- to corroborate that particular aspect that you did multiple deals. And to the degree that I can credit that testimony, there's been no evidence to give me a meaningful gauge on how many deals, how much.

So I certainly, under 3553, would have the ability to consider that as an aggravating factor, but I am not doing so. I'm placing no weight on the notion that you might have had a

bunch of deals with these particular defendants.

Now, it's not your first offense, and we will talk about that in a moment, but the relevant conduct is what you're being held responsible for, and that's what you're being sentenced on. That's what the government proved. That's what you're going to be sentenced on. You're not going to be sentenced on speculation. So I'm not going to do that.

Significant factors in aggravation are just punishment, respect for law, and deterrence, even though, hopefully, that's something that's been mitigated by some of the mitigating factors. And, as I indicated, the risk of recidivism exists even though it's probably less pronounced than in other cases because I have considered not only the age of your criminal conduct but the age you were then and the age you are now, at least as it relates to the 3553 factors.

I've also considered that there were long periods in prior custody and those failed to get a message through to you that you needed to change the course of your life.

And as I indicated, I have to sentence you based on the entire picture. And for better or worse -- and this is for worse -- when you were a very young man, you did some very bad things.

Attempted murder, that makes a difference when you come in again. When you've already had a prior conviction for drugs and then you come in again, those are factors in

aggravation, and they have to be reflected in the sentence.

So while I intend to have a substantial downward variance, I have to reflect everything, including the things that I'm sure you wish you could change.

I wish you had a time -- I've had defendants say before -- I think it would be true of any defendant -- if they had a time machine to go back and talk to their younger self and tell them not to do certain things.

But those things exist. The choices you made affect you as an older person. And that's just part of life.

I have to have a sentence under 3553 that includes not just the nature and circumstances of this offense but the history and characteristics of the defendant.

And there's some good. There's a lot of good. But there's some bad, too, so the Court has to reflect that.

Based on the 3553 factors, the Court will preview the sentence it intends to impose on Count 3 of the indictment. I'll ask the parties then if there's an objection or they request any further elaboration of my reasons under 3553 or otherwise.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of four years. Within 72 hours of release from Bureau of Prisons custody, the defendant shall report in person to the probation office in the district to which he is released. You've had difficulty in

making that transition before. The four years term is appropriate, even if it wasn't the guideline term. So I believe the four years is appropriate.

In terms of the conditions of supervised release, they'll consist of -- and I'm incorporating by reference Docket Entry 500 in this regard as to the proposed terms or proposed conditions -- Mandatory Conditions 1, 2, 5 and 6; Discretionary Condition 4 as written; Discretionary Condition 6 as written, including the names listed there; Discretionary Condition 7, that you shall refrain from any excessive use of alcohol defined as having a blood alcohol concentration greater than .08 percent and the rest of that condition; Discretionary Condition 8; Discretionary Condition 14: You shall not knowingly leave the federal judicial district where you're being supervised unless granted permission to leave by the Court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago; Discretionary Condition 15; Discretionary Condition 16: You shall permit a probation officer to visit at any reasonable time at home, at work, at school, at a community service location, and you shall permit confiscation of any contraband observed in plain view of the probation officer.

I'm not going to put in there the other reasonable locations specified by a probation officer. If that's necessary, they can address that with the Court during the term of supervised release. Discretionary Condition 17; Discretionary Condition 18 as written; Discretionary Condition 22; Discretionary 24 as written; Special Condition 3: At least 20 hours not to exceed 200 hours.

Based on the record, I do not intend to impose a fine, but the $100 assessment is mandatory. So I would impose Special Condition 10.

You shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release at a rate of not less than 10 percent of the total of your gross earnings minus federal and state income tax withholding.

Special Condition 11: You shall not enter into an agreement to act as an informer or special agent of law enforcement without special permission of the Court.

And I will not impose Special Condition 15, as I indicated. I believe it's covered materially by Mandatory 1, and certainly the government can pursue that if they believe it's necessary at a future time.

The $100 is mandatory. Restitution and forfeiture are not at issue. Based on the record, no fine will be imposed. Costs and interests will be waived.

It is the judgment of the Court that the defendant be committed to the Bureau of Prisons for a total term of 180 months on Count 3 of the indictment.

Do counsel for either side have any legal objection to the sentence I proposed or request any further elaboration of my reasons under 3553 both as to the term of imprisonment, the term or conditions of supervised release, or have any other objection as to sentencing?

On behalf of the defense?

MR. PISSETZKY: No.

THE COURT: On behalf of the government?

MS. DONOHUE: No, Your Honor.

THE COURT: Based on the record, the Court will impose the sentence I just stated. There's no counts to be dismissed because we already took care of the forfeiture, correct?

MS. DONOHUE: Only the forfeiture.

THE COURT: Okay. Defendant will be remanded.

Sir, any notice of appeal must be filed within 14 days of the entry of the judgment or within 14 days of the filing of notice of appeal by the government.

If requested, the Clerk will prepare and file a notice of appeal on your behalf.

If you cannot afford to pay the cost of an appeal or for appellate counsel, you can apply to have the Court waive the cost and appoint you a lawyer. Do you understand that,

sir?

THE DEFENDANT: Yeah.

THE COURT: All right. Anything further from the government?

MS. DONOHUE: No, thank you.

THE COURT: Anything, Counsel?

MR. PISSETZKY: We are going to ask Your Honor to recommend RDAP.

THE COURT: That will be part of it. Consistent with the needs of the defendant and the Bureau of Prisons, I'll have him recommended for evaluation for RDAP.

Anything other in terms of location?

MR. PISSETZKY: Close to Chicago.

THE COURT: Close to Chicago. Will do.

Anything else?

MR. PISSETZKY: No, Your Honor.

THE COURT: All right. Thanks, everyone. Good luck to you, sir.

Court's in recess.

(Concluded at 2:27 P.M.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen E. Sebastian* *12/31/2025*

Kathleen M. Sebastian Date
Official Court Reporter

MR

FILED
9/12/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
KG

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America,
Plaintiff-Appellee,

v.

Eugene Alexander,
Defendant-Appellant,

Case No. 17 CR 00319-3

Hon. John Blakey

NOTICE OF APPEAL

Please take Notice that Eugene Alexander, Defendant in the above captioned Case, Appeals the Sentence Imposed on August 22, 2025, pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

Respectfully Submitted,

Eugene Alexander
Eugene Alexander

CERTIFICATE OF APPEAL

I, Eugene Alexander, state under penalty of perjury that on September 2, 2025, I deposited this Notice of Appeal in the MCC Chicago Legal Mail System, first class postage prepaid and affixed thereto, addressed to Hon. Thomas Bruton, Clerk of the U.S. District Court for the Northern District of Illinois, 219 S. Dearborn St. Chicago, IL 60604.

Eugene Alexander
Eugene Alexander

Eugene Alexander
FED REG. # 52345-424
METROPOLITAN CORRECTIONAL CENTER
71 W. VAN Buren St.
Chicago, Il. 60605

S SUBURBAN IL 604
9 SEP 2025 PM 1 L

USA FOREVER

09/12/2025-21

Legal Mail

Hon. Thomas Bruton
Clerk, United States District Court
219 South Dearborn St.
Chicago, Il. 60604

E0604@1800 C005

METROPOLITAN CORRECTIONAL CENTER
71 W. VAN BUREN ST, CHICAGO, IL 60605
The enclosed letter was processed through special mailing procedures for forwarding to you
This letter has neither been opened nor inspected.

SEP 08 2025

If the writer raises a question or pr...lem over which this facility has jur...iction, you may wish to return the materia... further information or clarification. If the writer encloses correspondence for ... ...ding to ... ...ther addressee, please return the enclosure to the above address.

RECEIVED

SEP 12 2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

# UNITED STATES DISTRICT COURT

Northern District of Illinois

UNITED STATES OF AMERICA
v.
EUGENE ALEXANDER

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 1:17-CR-00319(3)

USM Number: 52343-424

Gal Pissetzky
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to Count(s)

☐ pleaded nolo contendere to Count(s) which was accepted by the court.

☒ was found guilty on Count(s) 3 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| Conspiracy To Distribute Controlled Substance | 04/11/2016 | 3 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Forfeiture allegation in the Indictment dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

August 22, 2025
Date of Imposition of Judgment

[signature]
Signature of Judge
John Robert Blakey, United States District Judge
Name and Title of Judge

9/5/25
Date

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
180 months as to Count 3.

☒ The court makes the following recommendations to the Bureau of Prisons: Consistent with the needs of the defendant and the Bureau of Prisons, the defendant is to be considered for designation at a facility with the RDAP program and as close to Chicago as possible.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at on

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2:00 pm on

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: ______________________________________________

______________________________________________

______________________________________________

Defendant delivered on __________ to ____________________ at ______________________, with a certified copy of this judgment.

______________________________
UNITED STATES MARSHAL

By ______________________________
DEPUTY UNITED STATES MARSHAL

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
Four (4) years as to Count 3.

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall not commit another Federal, State, or local crime.

☒ (2) you shall not unlawfully possess a controlled substance.

☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]

☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).

☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**.
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☐ (1) you shall provide financial support to any dependents if you are financially able to do so.

☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).

☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:

☒ (4) you shall seek, or work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s)) .

☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
- ☐ visit the following type of places: .
- ☒ knowingly meet or communicate with the following persons: Ricardo Castaneda, Santos Godina, and Kevin Miller Jr.

☒ (7) you shall refrain from ☐ any or ☒ excessive use of alcohol (defined as ☒ having a blood alcohol concentration greater than 0.08%; or ☐ ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

☐ (9)
- ☐ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
- ☐ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
- ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

.)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period .

☐ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of months.

☐ (12) you shall work in community service for hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: , or refrain from residing in a specified place or area:

☒ (14) you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: ,
☒ at home ☒ at work ☒ at school ☒ at a community service location
☐ other reasonable location specified by a probation officer
☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)

☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.

☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.

☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.

☐ from the times directed by the probation officer; or ☐ from __ to __.

☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.

☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☐ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

☒ (24) Other: you shall submit your person, property, house, residence, vehicle, papers, or office to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐ (1) if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2) you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☒ (3) you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed 200 hours.

☐ (4) you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☐ (5) you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☐ (6) you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☐ (7) within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☐ (8) you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9) you shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

- ☐ You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.
- ☐ The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.
- ☐ You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system
- ☐ You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.
- ☐ You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.
- ☐ You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

☐ This condition does not apply to your family members: [Names]

☐ Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer. Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity. You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐ You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐ You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒ (10) you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒ (11) you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐ (12) you shall pay to the Clerk of the Court $ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to (list both Agency and Address.)

☐ (13) if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐ (14) You shall observe one Reentry Court session, as instructed by your probation officer.

☐ (15) Other:

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $100.00 | $.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the .

☐ the interest requirement for the is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: EUGENE ALEXANDER
CASE NUMBER: 1:17-CR-00319(3)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☒ Lump sum payment of $100 due immediately.

☐ balance due not later than , or

☒ balance due in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal *(e.g. weekly, monthly, quarterly)* installments of $ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal *(e.g. weekly, monthly, quarterly)* installments of $ over a period of *(e.g., months or years)*, to commence *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties: you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.